[37 NYS3d 517]

Avi Dorfman, Respondent, et al., Plaintiff, v Robert Reffkin et al., Appellants.

First Department, September 22, 2016

## APPEARANCES OF COUNSEL

*Kirkland & Ellis LLP*, New York City (*Eric F. Leon, Atif Khawaja, John C. Vazquez* and *Lindsey R. Oken* of counsel), for appellants.

*Harris, St. Laurent & Chaudhry LLP*, New York City (*Jonathan Harris, L. Reid Skibell, David B. Deitch* and *Jared B. Foley* of counsel), and *Susman Godfrey LLP*, New York City (*Shawn J. Rabin, Arun Subramanian* and *Zachary Savage* of counsel), for respondent.

## OPINION OF THE COURT

RENWICK, J.

Plaintiff Avi Dorfman is a young entrepreneur who claims to be a former partner of defendant Robert Reffkin, the founder of the apartment search website Urban Compass. Plaintiff sues Reffkin and the company, accusing Reffkin of, inter alia, stealing proprietary information that helped Urban Compass reach a $360 million evaluation in 2014, only a year after it came to fruition. The dispositive issue on this appeal is whether the statute of frauds, as embodied in General Obligations Law § 5-701 (a) (10), bars the causes of action in the amended complaint for quantum meruit and unjust enrichment, through which Dorfman seeks compensation for services he provided in helping to found and initialize operations of Urban Compass.

### Factual and Procedural Background

"Inasmuch as this appeal had its genesis in a motion to dismiss pursuant to CPLR 3211 (a) (7), we are bound to, inter alia, 'accept the facts as alleged in the [amended] complaint as true' " (*JF Capital Advisors, LLC v Lightstone Group, LLC*, 25 NY3d 759, 762 [2015], quoting *Leon v Martinez*, 84 NY2d 83, 87 [1994]). In or about 2008, plaintiff Avi Dorfman began developing a web-based program that would allow renters to

search and apply for apartment rentals online without the assistance of a broker or other third party. Based on this premise, in 2010, Dorfman began developing iRent, a company which reached the beta testing phase, but never went "live." Dorfman went on to create a new company, RentJolt, into which iRent was merged, and which functioned as a brokerage firm, connecting current tenants to prospective renters. By January 2012, RentJolt was a functioning business with a live website.

In 2012, Dorfman sought investors for RentJolt. A friend suggested he meet defendant Reffkin, a Goldman Sachs investment banker interested in learning about and getting involved in the New York City real estate market. During the parties' first meeting on July 14, 2012, Dorfman observed that Reffkin was well versed in private equity and investment banking, but had limited knowledge of the New York real estate market. Dorfman discussed his experiences in real estate, as well as his vision for RentJolt. Reffkin expressed an interest in partnering with Dorfman to create a new, web-based start-up for real estate rentals, which would come to be known as "Urban Compass."

Recognizing that Urban Compass would be a direct competitor of RentJolt, Reffkin consulted with his attorney, who advised him to acquire RentJolt. To that end, Urban Compass and RentJolt executed a confidentiality and nondisclosure agreement dated July 23, 2012 (NDA), which Dorfman signed on behalf of RentJolt, and Reffkin signed on behalf of Urban Compass (then identified as Newco). The NDA indicates that it was entered in contemplation of a "possible negotiated transaction between the two companies" and provides, in section 11 (b):

> "Each party recognizes and acknowledges the competitive value and confidential nature of the Evaluation Material of the other party and that irreparable damage may result to the other party if information contained therein or derived therefrom is disclosed to any person except as herein provided or is used for any purpose other than the evaluation of a possible negotiated transaction between the parties."

Section 8 of the NDA, entitled "No Representations and Warranties," provides in relevant part:

> "(a) . . . Only those representations or warranties which are made in a definitive agreement between

the parties, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect. For purposes of this Agreement, the term 'definitive agreement' does not include any executed letter of intent or any other preliminary written agreement, nor does it include any written or verbal acceptance of any offer or bid made by one party.

"(b) Each party understands and agrees that no contract or agreement providing for any transaction involving the parties shall be deemed to exist unless and until a definitive agreement has been executed and delivered and each party hereby waives in advance any claims, including without limitation claims for breach of contract, in connection with any transaction between the parties unless and until the parties shall have entered into a definitive agreement. Each party also agrees that unless and until a definitive agreement regarding a transaction between the parties has been executed and delivered, neither party will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of this Agreement or any other written or oral communication with respect to such transaction, except for the matters specifically agreed to herein."

The NDA also contains a covenant not to sue, with a carve out for "the other party's failure to comply with its promises and provide benefits under this Agreement."

In reliance on the protections under the NDA, RentJolt provided Reffkin and Urban Compass with proprietary and confidential information solely for the purpose of allowing Urban Compass to assess whether to acquire RentJolt. In particular, RentJolt provided Reffkin and Urban Compass with a list of its assets, as well as full access to iRent and RentJolt's confidential and proprietary information, including proprietary software code. Further, Dorfman alleges that he made significant contributions to Urban Compass's formation, which were separate and apart from RentJolt's preexisting trade secrets. For instance, he developed materials aimed at securing financing and recruiting engineers and helped develop Urban Compass' software. Dorfman also created a budget for Urban Compass, as well as a model showing how the company would

differentiate itself from a traditional brokerage firm, and a proposal detailing the vision for Urban Compass's development and goals.

Dorfman alleges that in July 2012, Goldman Sachs made a $6 million initial investment in Urban Compass, due in large part to his efforts. He also successfully convinced Ori Allon, Twitter's New York director of engineering, to leave Twitter and join Urban Compass.

In August, Dorfman negotiated with Reffkin and Allon regarding a position with Urban Compass and compensation. A few offers were made which included a combination of equity and base salary, but Dorfman rejected them, finding them to be "insulting" and believing that they "greatly minimized" the work he had done for Urban Compass.

The parties never executed a "definitive agreement" (other than the NDA), and Urban Compass ultimately did not acquire RentJolt. On September 17, 2012, RentJolt sent Urban Compass a cease and desist letter reminding Urban Compass that the NDA prohibited the use of RentJolt's trade secrets. Urban Compass's chief operating officer responded by noting that there was no agreement between Urban Compass and Dorfman.

Urban Compass's website went live in May 2013, allegedly premised on iRent and RentJolt's confidential and proprietary information, as well as ideas separately developed by Dorfman. Urban Compass was an immediate success and received considerable acclaim, being named by CNN as one of 10 "Start-Ups to Watch." By July 2014, a little more than one year after its launch, Urban Compass was valued at about $360 million. Dorfman alleges that without his input in the early stages of Urban Compass' formation, the company never would have grown as fast or as big as it did.

According to Dorfman, defendants did not compensate him for his valuable work. Consequently, Dorfman and RentJolt commenced this action by filing a complaint which asserts, inter alia, claims for breach of contract, breach of implied contract, unjust enrichment, and quantum meruit. The breach of contract claim is asserted by RentJolt against Urban Compass and Reffkin and is based upon the alleged violation of the NDA. The breach of implied contract is asserted by Dorfman and RentJolt against Reffkin and Urban Compass. The unjust enrichment and quantum meruit claims are asserted by Dorfman and RentJolt against Reffkin and Urban Compass.

Defendants moved pursuant to CPLR 3211 (a) (1) and (7) to dismiss all the claims except for the breach of contract claim. Defendants argued, inter alia, that plaintiffs' claim for breach of implied contract, unjust enrichment and quantum meruit are barred by the statute of frauds.

The court dismissed the cause of action for breach of implied contract as void under the statute of frauds, holding that Dorfman's efforts to form Urban Compass involved a "business opportunity" covered thereunder. The court rejected defendants' argument that the statute of frauds precludes the claims for unjust enrichment and quantum meruit, and declined to dismiss those causes of action as asserted by Dorfman. However, it held that section 8 of the NDA precludes RentJolt from asserting claims for unjust enrichment and quantum meruit in the alternative to its claim for breach of the NDA, and granted defendants' motion to dismiss those two claims as asserted by RentJolt. As indicated, the only issue in dispute on this appeal is whether the claims of quantum meruit and unjust enrichment, through which Dorfman seeks compensation for helping to found and initialize the operations of Urban Compass, should also have been dismissed as precluded by the statute of frauds.

## Discussion

The statute of frauds is codified in General Obligations Law § 5-701. Under the statute of frauds, to be enforceable, certain types of agreements cannot be oral; they must be in writing. Simply stated, the purpose of the statute is to prevent perjury and fraud and to preserve the integrity of contracts (*William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh*, 22 NY3d 470, 476 [2013]; *Morris Cohon & Co. v Russell*, 23 NY2d 569, 574 [1969]).

This appeal concerns a lesser-known provision of the statute of frauds, that is, General Obligations Law § 5-701 (a) (10), which requires a writing in an agreement pertaining to the negotiation of services for the purchase of real estate or of a business opportunity. Specifically, it provides, in pertinent part:

> "a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: . . .

"10. Is a contract to pay compensation for services rendered in . . . negotiating the purchase . . . of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein . . . ."

The same paragraph further states that " '[n]egotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction" (*id.*).

The tension around this section concerns the scope of services within the meaning of "negotiating . . . a business opportunity" (*id.*). In this appeal, defendants argue that because the motion court dismissed plaintiff Dorfman's implied contract claim, as barred by the statute of frauds, the court was required to dismiss plaintiff's quasi contract (quantum meruit and unjust enrichment) claims as well. Defendants' argument, however, is based on the false premise that the quasi contract claims and the implied contact claim overlap as all seeking compensation for the work Dorfman performed in creating Urban Compass, which would be barred as "assisting in the negotiation or consummation" of the business opportunity (*id.*).

Plaintiff Dorfman, however, alleges that he provided services clearly extending beyond the negotiation of a business opportunity, including developing materials to secure investor backing, recruiting engineers and others to join Urban Compass, and developing the details of how Urban Compass's software product, web, and mobile applications would be "architected." When alleged services go beyond the negotiation of a business opportunity, claims for unjust enrichment and quantum meruit should be sustained (*see Ashwood Capital, Inc. v OTG Mgt., Inc.*, 99 AD3d 1, 10-11 [1st Dept 2012]; *Venetis v Stone*, 81 AD3d 503 [1st Dept 2011]).

Nevertheless, defendants argue that any other work Dorfman may have performed is intertwined with his alleged work in "assisting in the negotiation or consummation of the business opportunity." As fully explained below, however, the Court of Appeals has rejected defendants' broad interpretation of the term negotiating a business opportunity within the meaning of General Obligations Law § 5-701 (a) (10).

To be sure, General Obligations Law § 5-701 (a) (10)'s sweep is comprehensive as it covers conduct at the outset, during the course of, and at the conclusion of the services rendered for the purpose of "assisting in the negotiation or consummation" of a

business opportunity, as illustrated by the Court of Appeals' pronouncement in *Snyder v Bronfman* (13 NY3d 504 [2009]). In *Snyder*, the Court of Appeals held that General Obligations Law § 5-701 (a) (10) applied where the plaintiff alleged "that he devoted years of work to finding a business to acquire and causing an acquisition to take place—efforts that ultimately led to defendant's acquisition of his interest in Warner Music" (*Snyder* at 509). Specifically, the plaintiff in *Snyder* alleged that he "developed . . . a series of business relationships with key figures in the corporate and investment banking communities," "met with defendant and defendant's other business associates to discuss possible acquisitions," "worked on several aborted deals," and "was a major contributor" to the defendant's eventual successful acquisition of Warner Music (*id.* at 507 [internal quotation marks omitted]). The plaintiff "identified the opportunity, persuaded [the] defendant of its merits, helped to get debt financing[,] and obtained financial information from the target company [Warner Music]" (*id.*). The Court of Appeals held that "[i]n seeking reasonable compensation for [these] services, plaintiff obviously seeks to be compensated for finding and negotiating the Warner Music transaction," and that such a "claim is of precisely the kind the statute of frauds describes" (*id.* at 509). In so finding, the Court affirmed this Court's dismissal of the plaintiff's claims.

The Court of Appeals has, however, warned against the "pitfalls" of interpreting General Obligations Law § 5-701 (a) (10) too broadly (*Sporn v Suffolk Mktg.*, 56 NY2d 864, 865 [1982]; *see e.g. Freedman v Chemical Constr. Corp.*, 43 NY2d 260 [1977]). The reason for this concern is that "[t]oo broad an interpretation would extend the writing requirement" to situations beyond those intended by the legislature (*Freedman*, 43 NY2d at 266). Thus, the Court of Appeals has cautioned that the interpretation of General Obligations Law § 5-701 (a) (10) should be decided on a "case-by-case basis" to avoid "sweeping generalizations" about its scope (*Sporn v Suffolk Mktg.*, 56 NY2d at 865; *see also Freedman*, 43 NY2d at 267; *Tower Intl., Inc. v Caledonian Airways, Ltd.*, 133 F3d 908 [2d Cir 1998] [table; text at 1998 WL 3614, *2, 1998 US App LEXIS 206, *6-7 (1998)]).

Indeed, just recently in *JF Capital Advisors, LLC v Lightstone Group, LLC* (25 NY3d 759 [2015], *supra*), the Court rejected this Court's interpretation of General Obligations Law § 5-701 (a) (10) as barring recovery for all services rendered in

connection with business opportunities including those that went beyond assisting in the negotiation or consummation of such opportunity. In that case, the plaintiff commenced an action against the Lightstone Group, LLC, seeking to be paid for investment advisory service in connection with the defendants' acquisition of certain hotels and other investment opportunities (*id.* at 762). In lieu of answering, the defendant moved to dismiss the amended complaint pursuant to CPLR 3211 (a) (7), contending that the claims for compensation of the advisory services based on the theories of unjust enrichment and quantum meruit were barred by the statute of frauds (*id.* at 763-764). As relevant to this appeal, Supreme Court denied the dismissal of the claims pertaining to five of the alleged 12 business opportunities for which the plaintiff provided advisory services (*id.*). The Court held that the statute of frauds was not applicable to such claims for compensation because the advisory information the plaintiff provided was not later used to assist in the negotiations or consummation of any business opportunity. Instead, the information that JP Capital provided just informed Lightstone of what those business opportunities would cost and be worth if it pursued those opportunities. This Court, however, held that these claims for compensation should have been dismissed because "investment analyses and financial advice regarding the possible acquisition of investment opportunities clearly fall within" the negotiation of a business opportunity (*JF Capital Advisors, LLC v Lightstone Group, LLC*, 115 AD3d 591, 592-593 [1st Dept 2014] [internal quotation marks omitted]).

The Court of Appeals reinstated these quasi contract claims, agreeing with Supreme Court's narrower interpretation of the term "negotiating . . . a business opportunity" (*JF Capital Advisors, LLC*, 25 NY3d at 766). Specifically, the Court held that tasks performed so as to inform the defendants whether to partake in certain business opportunities were not performed within the meaning of assisting in the negotiation or consummation of a business opportunity (*id.* at 767). Rather, in the Court's view, "work performed so as to inform defendants whether to partake in certain business opportunities" is intended for the narrower purpose of deciding "*whether to negotiate*" (*id.* at 766). In so doing, the Court of Appeals distinguished *Snyder* as being more akin to the seminal case of *Freedman* (43 NY2d 260).

In *Freedman*, the Court held that an oral agreement under which the plaintiff was to negotiate a construction contract on

the defendant's behalf in exchange for a fee was unenforceable under the statute of frauds (*id.* at 267). The Court explained that section 5-701 (a) (10) "applies to various kinds of intermediaries who perform limited services in the consummation of certain kinds of commercial transactions" (*id.* at 266). In *Freedman,* the Court found that the agreement by which the plaintiff "was to use his 'connections,' his 'ability,' and his 'knowledge' to arrange for [the defendant] to meet 'appropriate persons' " so that the defendant could procure a construction contract fell within the statute of frauds (*id.* at 267). The Court explained that where the "intermediary's activity is so evidently that of providing 'know-how' or 'know-who,' in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise," the statute of frauds applies (*id.*).

In the present case, the amended complaint contains allegations that, if accepted by the trier of fact, demonstrate that plaintiff's role consisted of more than functioning as an intermediary that assisted in the negotiation or consummation of the business opportunity. Rather, Dorfman allegedly rendered a wide variety of services, which presumably took place after the company came to fruition, making these services related to a purpose other than "assisting in the negotiation or consummation" of a business opportunity, so as to escape the strictures of General Obligations Law § 5-701 (a) (10).

To be clear, we simply hold that Dorfman's unjust enrichment and quantum meruit claims were properly sustained, but only insofar as they involved services that went beyond the negotiation or consummation of a business opportunity pursuant to General Obligations Law § 5-701 (a) (10). The motion court, however, sustained those claims based on all the alleged services provided. As defendants correctly indicate, the amended complaint also avers that Dorfman was negotiating a business opportunity for defendants by providing know-how in bringing a business enterprise to fruition. Those alleged services clearly fall under the statute of frauds and should have been dismissed.

Accordingly, the order of the Supreme Court, New York County (Jeffrey K. Oing, J.), entered September 10, 2015, which, insofar as appealed from as limited by the briefs, denied defendants' motion to dismiss plaintiff Avi Dorfman's claims for unjust enrichment and quantum meruit, should be modified, on the law, to grant the motion only to the extent the services

allegedly provided by plaintiff Avi Dorfman fall under General Obligations Law § 5-701 (a) (10), and otherwise affirmed, without costs.

ACOSTA, J.P., SAXE, RICHTER and GISCHE, JJ., concur.

Order, Supreme Court, New York County, entered September 10, 2015, modified, on the law, to grant the motion only to the extent the services allegedly provided by plaintiff Avi Dorfman fall under General Obligations Law § 5-701 (a) (10), and otherwise affirmed, without costs.