dMY Sponsor, LLC v Glatt (2023 NY Slip Op 50547(U))

[*1]

dMY Sponsor, LLC v Glatt

2023 NY Slip Op 50547(U)

Decided on June 6, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 6, 2023
Supreme Court, New York County

dMY Sponsor, LLC, DMY TECHNOLOGY GROUP, INC., and GTY TECHNOLOGY HOLDINGS, INC., Plaintiffs,

against
Carter Glatt and CAPTAINS NECK HOLDINGS, LLC, Defendants.
CARTER GLATT, CAPTAINS NECK HOLDINGS LLC, and DUNE ACQUISITION HOLDINGS LLC, Counterclaimants,
against
DMY SPONSOR, LLC, DMY TECHNOLOGY GROUP, INC., GTY TECHNOLOGY HOLDINGS, INC., DMY SPONSOR II, LLC, DMY TECHNOLOGY GROUP, INC. II, DMY SPONSOR III, LLC, DMY TECHNOLOGY GROUP, INC. III, HARRY L. YOU, and NICCOLO DE MASI, Counterclaim Defendants.

Index No. 653903/2020

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 005) 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 151, 152, 153 were read on this motion to DISMISS.
In this action, counterclaimants allege, among other things, that counterclaim defendants breached an oral agreement. Counterclaim defendants dMY Sponsor, LLC (dMY Sponsor), dMY Technology Group, Inc. (dMY Technology) (together, dMY), GTY Technology Holdings, Inc. (GTY), dMY Sponsor II, LLC, dMY Technology Group, Inc. II, dMY Sponsor III, LLC, dMY Technology Group, Inc. III, Harry L. You (You), and Nicholas de Masi (de Masi) move, pursuant to CPLR 3211 (a) (1) and (7), to dismiss counts three, four, five, six, seven, and eight of the amended counterclaims asserted by counterclaimants Carter Glatt (Glatt), Captains Neck Holdings LLC (Captains Neck), and Dune Acquisition Holdings LLC (Dune Sponsor). For the reasons set forth below, the motion is granted in part.
 BACKGROUND
The following facts are taken from the amended answer and counterclaims. 
According to counterclaimants, Glatt and You have known each other for decades (NY St Cts Elec Filing [NYSCEF] Doc No. 127, amended answer and amended counterclaims ¶ 25). You recruited Glatt to work at GTY, which You co-founded (id., ¶ 24). You is 61 years old, while Glatt is 27 years old (id., ¶ 25). Counterclaimants allege that You "was a trusted friend of [Glatt's] father and a mentor with years of experience" (id., ¶ 26). Counterclaimants also allege that Glatt is a member of Captains Neck (id., ¶ 39). de Masi is the chief executive officer and director of dMY Technology Group, Inc. II and dMY Technology Group, Inc. III (id., ¶ 21). 
Glatt and You began work on a separate enterprise, a "special purpose acquisition company" (SPAC), also known as a "blank-check company," which became dMY (id., ¶ 29). According to counterclaimants, the purpose of a SPAC is to go public in order to acquire or merge with another company using the proceeds of the SPAC's initial public offering (IPO) (id.). In January 2019, on a flight from New York to Los Angeles, You represented to Glatt that Glatt would be a full partner in dMY along with You, that Glatt would serve as the chief financial officer and a board member of dMY, and that Glatt would be offered an investment commensurate with being a partner (id., ¶ 31).
In reliance on these promises and representations, Glatt allegedly performed substantial work for dMY, and gave up other opportunities (id., ¶ 33). As a result, dMY Technology went public in February 2020 (id.). Glatt alleges that he "performed due diligence on potential acquisition targets for dMY, structured potential investments, and performed extensive and necessary work in connection with dMY's [IPO]"; "selected and evaluated UBS, leading to it serving as one of two underwriters of the dMY IPO"; "worked with UBS to structure the enterprise and the IPO"; "performed in-depth evaluations of other potential underwriters, leading to the selection of Goldman Sachs as the second underwriter of the dMY IPO" and "raised approximately $900,000 in urgently needed capital," which was essential to the success of the IPO (id., ¶¶ 33, 36). 
In January 2020, You formally offered Glatt an investment opportunity in dMY (id., ¶ 38). On or about February 15, 2020, You emailed Glatt two agreements: (1) an operating agreement for dMY Sponsor; and (2) the dMY Sponsor Subscription Agreement (id.). The Subscription Agreement provided that dMY Sponsor would issue and sell to Captains Neck 251,250 "Class Y Units" of dMY Sponsor registered in the name of Captains Neck in exchange for $125,000 (id., ¶ 41). Glatt accepted the investment offer on behalf of Captains Neck, relying on You's representation that Glatt would become chief financial officer of dMY and would receive a significant catch-up provision of equity in dMY (id., ¶ 44). Glatt wired the money to You, and Glatt and You executed the Subscription Agreement (id., ¶¶ 39-41). Counterclaimants allege that, prior to execution of the Subscription Agreement, You proposed a side letter outlining terms under which Captains Neck's investment in dMY would be forfeited (id., ¶¶ 46-48). Counterclaimants allege, however, that the side letter was never executed or finalized (id., ¶¶ 48-56).
According to counterclaimants, Glatt's employment at GTY was terminated effective April 3, 2020 (id., ¶ 59). 
Although You promised that Glatt would work for dMY after he left GTY, no such offer was made (id., ¶¶ 50, 56). Once dMY went public, You and dMY never made good on any of their promises to Glatt (id., ¶ 69). You and de Masi then formed subsequent SPACs, dMY [*2]Technology Group, Inc. II and dMY Technology Group, Inc. III, drawing on the success of dMY and the plan developed by Glatt (id., ¶ 74). 
In July 2020, dMY and You asserted that counterclaimants' investment in DMY had been forfeited based upon the side letter (id., ¶ 68). On July 25, 2020, Glatt received a parcel containing a check from UBS Financial Services for the amount of the purchase price (id., ¶ 72). Counterclaimants allege that they have not redeemed this check (id.). dMY claimed that Captains Neck's investment was conditioned upon Glatt "becoming employed by dMY Technology Group, Inc.," and "continuing [his] employment with GTY Technology Holdings, Inc." (id., ¶ 69). 
Counterclaimants further allege that dMY and You have made disparaging allegations about Glatt's termination from GTY (id., ¶¶ 76, 77). These allegations were allegedly made solely so they would end up in the press (id.). Counterclaimants allege that paragraphs 24 and 33 of the amended complaint "have no relevance to the sole declaratory judgment cause of action asserted by dMY in the original complaint in this action (and retained in the Amended Complaint)" (id., ¶ 76). The amended complaint alleges as follows:
"24. While the Side Letter was never formally agreed to or executed, partially due to Mr. Glatt's fraudulent misrepresentations about his intentions with respect to both dMY and GTY, and his subsequent termination by GTY, Mr. Glatt was aware that his entitlement to the Class Y Units was conditioned upon the execution of the Side Letter.
***
"33. In the course of those negotiations, as well as during other related discussions, Mr. Glatt's behavior and actions offended several GTY executives and members of the company's Board. These individuals are highly respected business leaders in this country including four former public company CEOs and a Senior Partner of a leading investment bank. Among other things, Mr. Glatt was disrespectful, insubordinate and attempted to sabotage the then-CEO of GTY, whom he reported to in addition to the CFO. This led to the decision by the Board of GTY to fire him.
(NYSCEF Doc No. 124, amended complaint ¶¶ 24, 33).
On September 14, 2020, an SPAC trade publication called SPACInsider repeated the false and disparaging allegations that Glatt's "behavior and actions offended several GTY executives and members of the company's Board," and that "Mr. Glatt was disrespectful, insubordinate and attempted to sabotage the then-CEO of GTY," which "led to the decision by the Board to fire him" (NYSCEF Doc No. 127 ¶¶ 76-78). Counterclaimants further allege that You notified SPACInsider of these allegations, and made additional disparaging allegations about Glatt's professional experience (id., ¶¶ 78, 79). As a result, SPACInsider also questioned whether Glatt was qualified to run his own company, by focusing on the fact that Glatt worked at Barclays after college, but not in a senior investment banking role (id.). The newsletter stated "if he did hold a senior role, it would have been listed as a counterpoint to his age to further elucidate his abilities. But it didn't" (id.). 
Counterclaimants also allege that the negative publicity has harmed them professionally and financially (id., ¶ 82). By way of background, Glatt is the chief executive officer of Dune Acquisition Corp. (Dune) (id., ¶ 83). Counterclaimants claim that "[a]s a result of the dissemination of these falsehoods, Dune's underwriters (including Cantor Fitzgerald, which was identified in Dune's public filings) and potential investors have been dissuaded to underwrite and [*3]invest, respectively in Dune's initial public offering of securities" (id., ¶ 85).
Counterclaimants originally asserted the following counterclaims: (1) declaratory judgment; (2) breach of contract; (3) fraudulent misrepresentation; and (4) negligent misrepresentation (NYSCEF Doc No. 125, original counterclaims ¶¶ 61-70, 71-79, 80-86, 87-92). 
Previously, counterclaim defendants moved to dismiss the counterclaims for breach of contract, fraudulent misrepresentation, and negligent misrepresentation. On November 16, 2020, Justice Arlene P. Bluth, among other things, denied the motion to the extent that it sought dismissal of the fraudulent misrepresentation and negligent misrepresentation counterclaims (DMY Sponsor, LLC v Glatt, 2020 NY Slip Op 33808 [U], **6-**8 [Sup Ct, NY County 2020]). 
Counterclaimants subsequently amended their counterclaims (NYSCEF Doc No. 127). As relevant here, the amended counterclaims are as follows: (1) fraudulent misrepresentation (count three); (2) negligent misrepresentation (count four); (3) breach of contract (count five); (4) tortious interference with business relations (count six); (5) quantum meruit (count seven); and (6) unjust enrichment (count eight) (id., ¶¶ 110-117, 118-125, 126-133, 134-139, 140-144, 145-148).[FN1]

DISCUSSION
"On a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7), '[w]e accept the facts as alleged in the complaint as true, accord plaintiff[] the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory'" (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 141 [2017], quoting Leon v Martinez, 84 NY2d 83, 87-88 [1994]). Under CPLR 3211, "the pleadings are necessarily afforded a liberal construction" (Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 [2002]). However, "bare legal conclusions, as well as factual claims either inherently incredible or flatly contradicted by documentary evidence are not presumed to be true and accorded every favorable inference" (Biondi v Beekman Hill House Apt. Corp., 257 AD2d 76, 81 [1st Dept 1999], affd 94 NY2d 659 [2000] [internal quotation marks and citation omitted]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]).
To succeed on a CPLR 3211 (a) (1) motion based upon documentary evidence, the documentary evidence must "utterly refute[] plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (Goshen, 98 NY2d at 326). "A paper will qualify as 'documentary evidence' only if it satisfies the following criteria: (1) it is 'unambiguous'; (2) it is of 'undisputed authenticity'; and (3) its contents are 'essentially undeniable'" (VXI Lux Holdco S.A.R.L. v SIC Holdings, LLC, 171 AD3d 189, 193 [1st Dept 2019], quoting Fontanetta v John Doe 1, 73 AD3d 78, 86, 87 [2d Dept 2010]). 
A. Fraudulent Misrepresentation (Count Three)
The third amended counterclaim asserts a claim for fraudulent misrepresentation by Glatt against dMY Sponsor, dMY Technology, and You (NYSCEF Doc No. 127 ¶¶ 110-117).
Counterclaim defendants contend that Glatt's fraudulent misrepresentation claim must be dismissed because: (1) it is based on allegations of future intent; (2) it is duplicative of count five for breach of contract and seeks damages based on the loss of a contractual bargain; and (3) fails to plead cognizable damages.
In order to state a cause of action for fraudulent misrepresentation, "a plaintiff must allege 'a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury'" (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011], quoting Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996]). Moreover, CPLR 3016 (b) requires that "the circumstances constituting the wrong shall be stated in detail." The plaintiff must "'set forth specific and detailed factual allegations that the defendant personally participated in, or had knowledge of any alleged fraud'" (Friedman v Anderson, 23 AD3d 163, 166 [1st Dept 2005], quoting Handel v Bruder, 209 AD2d 282, 282-283 [1st Dept 1994]). 
Counterclaimants argue that dismissal of the third amended counterclaim is precluded by the single motion rule. CPLR 3211 (e) provides that "At any time before service of the responsive pleading is required, a party may move on one or more of the grounds set forth in subdivision (a), and no more than one such motion shall be permitted." "This is designed to avoid duplication and repeated postponement of the service of the answer" (Siegel, New York Practice § 273 [6th ed 2018]). Here, counterclaim defendants' arguments regarding the third amended counterclaim are barred by the single motion rule, as the third amended counterclaim is exactly the same as the original counterclaim for fraudulent misrepresentation (see Simon v FrancInvest, S.A., 192 AD3d 565, 567 [1st Dept 2021], appeal dismissed 37 NY2d 1005 [2021] [single motion rule barred motion to dismiss causes of action in third amended complaint where defendants previously moved to dismiss exact same causes of action in second amended complaint]; Landes v Provident Realty Partners II, L.P., 137 AD3d 694, 694 [1st Dept 2016] [court correctly denied motion to dismiss where "defendants had the full opportunity to raise their current CPLR 3211 (a) arguments on their original CPLR 3211 (a) motion to dismiss"]; cf. Barbarito v Zahavi, 107 AD3d 416, 420 [1st Dept 2013] ["single motion rule" did not bar motion to dismiss amended complaint where the fraud claim was "not the same as the corresponding cause of action in the original complaint"]). 
To be sure, the amended counterclaim makes the same essential allegations against the same counterclaim defendants as in the original counterclaim. They both allege that counterclaim defendants represented that Glatt would become the chief financial officer and a director of dMY Technology, that Glatt would be offered an opportunity to invest in dMY on the same terms as You and de Masi, that these representations were false when made, and that Glatt performed substantial work and gave up other opportunities in reliance on those representations (NYSCEF Doc Nos. 125, 127). Justice Bluth previously held that the counterclaim for fraudulent misrepresentation stated a cause of action. Justice Bluth determined that, "[a]ssuming all the allegations to be true, as the Court must, Mr. Glatt took numerous steps in reliance on the promise of a lucrative business opportunity and he now claims that Mr. You never had any intention of hiring him," and "[u]nder these circumstances, it was reasonable for Mr. Glatt to rely on these promises and he claims that he did substantial work for Mr. You because of the proposed business arrangement" (DMY Sponsor, LLC, 2020 NY Slip Op 33808 [U], **7). 
Accordingly, counterclaim defendants are not entitled to dismissal of the third amended [*4]counterclaim.
B. Negligent Misrepresentation (Count Four)
The fourth amended counterclaim, brought by Glatt against dMY Sponsor, dMY Technology, and You, similarly alleges that counterclaim defendants represented that Glatt would become the chief financial officer and a director of dMY Technology, and that Glatt would be offered an opportunity to invest in dMY on equivalent terms as You and de Masi (NYSCEF Doc No. 127 ¶ 120). Counterclaimants also allege that counterclaim defendants knew or should have known that these representations were false when made, and that the representations were made at a time when a special relationship existed between You and Glatt (id., ¶¶ 122, 123). 
Counterclaim defendants argue that Glatt's negligent misrepresentation claim is insufficient because there is no special or privity-like relationship between Glatt and You, and counterclaimants fail to plead justifiable reliance.
To state a cause of action for negligent misrepresentation, the plaintiff must allege: "'(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information'" (Mandarin Trading Ltd., 16 NY3d at 180, quoting J.A.O. Acquisition Corp. v Stavitsky, 8 NY3d 144, 148 [2007], rearg denied 8 NY3d 939 [2007]). In addition, "liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified" (Kimmell v Schaefer, 89 NY2d 257, 263 [1996]). New York courts take a cautious approach in determining whether a relationship sufficient to support a negligent misrepresentation exists (Sykes v RFD Third Ave. 1 Assoc., LLC, 67 AD3d 162, 165 [1st Dept 2009], affd 15 NY3d 370 [2010]). 
While the question of whether a special relationship exists is generally a question of fact (Kimmell, 89 NY2d at 264), where the claimant's allegations, accepted as true and given every reasonable inference, fail to plead the existence of a special relationship, a negligent misrepresentation claim is subject to pre-answer dismissal (Mandarin Trading Ltd., 16 NY3d at 181). 
Even accepting the allegations as true, counterclaimants fail to allege a special or privity-like relationship imposing a duty on the part of counterclaim defendants to impart correct information to Glatt (see Chai-Chen v Metropolitan Life Ins. Co., 190 AD3d 635, 636 [1st Dept 2021] [friendship with former coworker did not create "the existence of a special relationship or heightened duty"]). Indeed, counterclaimants merely allege that "a special relationship existed between Mr. You and Mr. Glatt," "Mr. You and Mr. Glatt had known each other for decades," "Mr. You and Mr. Glatt's father had worked together as contemporaries years prior," and that "Mr. Glatt viewed Mr. You as a trusted friend of his father and a mentor with years of experience, which view was bolstered by the years that Mr. Glatt worked directly with Mr. You on various projects" (NYSCEF Doc No. 127 ¶¶ 25-27, 123). 
Therefore, the fourth amended counterclaim is dismissed.
C. Breach of Contract, Quantum Meruit, and Unjust Enrichment (Counts Five, Seven, and Eight)
The statute of frauds, General Obligations Law § 5-701 (a) (10), requires that a "contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business [*5]opportunity, business, its good will, inventory, fixtures or an interest therein" be in writing. The statute provides that " [n]egotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction" (id.). It further states that "[t]his provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman" (id.). 
The statute of frauds is intended "to guard against the peril of perjury" and "to prevent the enforcement of unfounded fraudulent claims" (Morris Cohon & Co. v Russell, 23 NY2d 569, 574 [1969]). The Court of Appeals has instructed that the reach of section 5-701 (a) (10) is to be determined on a case-by-case basis (Sporn v Suffolk Mktg., 56 NY2d 864, 865 [1982]). 
The Court of Appeals has also made clear that unjust enrichment and quantum merit claims qualify as claims under "a contract implied . . . in law to pay reasonable compensation" (Snyder v Bronfman, 13 NY3d 504, 508 [2009], quoting General Obligations Law § 5-701 [a] [10]). 
Counterclaim defendants argue that Glatt's breach of contract, quantum meruit, and unjust enrichment claims fail because Glatt negotiated for the purchase of a business opportunity, which had to be in writing. 
Counterclaimants contend, in opposition, that they sufficiently allege an oral agreement: they allege that Glatt "would be [made] a full and equal partner in dMY [], would be made the Chief Financial Officer and a Director, and would be offered the opportunity to make an investment equal to that made by You and de Masi" (NYSCEF Doc No. 140 at 16). Moreover, counterclaimants assert that the oral agreement is not barred by the statute of frauds, because he did not negotiate for the purchase of a business opportunity. Glatt's tasks were performed so as to inform counterclaim defendants whether to partake in certain business opportunities. They also maintain that Glatt did not serve as a third-party intermediary on behalf of dMY. Rather, counterclaimants assert that they have sufficiently alleged indicia of the existence of a joint venture.
In Freedman v Chemical Constr. Corp. (43 NY2d 260, 263 [1977]), the Court of Appeals held that an alleged oral agreement to pay the plaintiff a 5% fee for his role in participation in obtaining a multimillion dollar construction contract was barred by the statute of frauds. There, the plaintiff was to "use his 'connections', his 'ability', and his 'knowledge' to arrange for [the defendant] to meet 'appropriate persons' and somehow to procure for it the opportunity to build the multimillion dollar plant" (id. at 267). The Court explained that:
"where, as in the instant case, the intermediary's activity is so evidently that of providing 'know-how' or 'know-who', in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise, the statute is entitled to be read both in accordance with its plain meaning, its evident purpose, and to accomplish the prevention of the mischief for which it was designed"
(id.).
Similarly, in Snyder, the Court held that quantum meruit and unjust enrichment claims to recover the value of plaintiff's services in helping to achieve a corporate acquisition were barred by the statute of frauds (Snyder, 13 NY3d at 509). In that case, the "plaintiff worked on trying to put together acquisitions," "developed for the Joint Venture a series of business relationships with key figures in the corporate and investment banking communities," "met with defendant [*6]and defendant's other business associates to discuss possible acquisitions," and "worked on several aborted deals" (id. at 507). The plaintiff "was a major contributor to [t]he success [of the acquisition]: he identified the opportunity, persuaded defendant of its merits, helped to get debt financing and obtained financial information from the target company" (id.). The Court held that "[i]n seeking reasonable compensation for his services, plaintiff obviously seeks to be compensated for finding and negotiating the Warner Music transaction" and that his "claim is of precisely the kind the statute of frauds describes" (id. at 509).
By contrast, in JF Capital Advisors, LLC v Lightstone Group, LLC (25 NY3d 759, 766 [2015]), the Court held services "performed so as to inform defendants whether to partake in certain business opportunities, that is, whether to negotiate" were not barred by the statute of frauds (see also Sonenshine Partners, LLC v Duravant LLC, 191 AD3d 567, 569 [1st Dept 2021] [quantum meruit/unjust enrichment claims were not barred by the statute of frauds where the plaintiff "allegedly performed work aimed at informing Duravant whether to purchase Maillis or one of its subsidiaries"]).
In the instant case, Glatt's counterclaims for breach of contract, unjust enrichment, and quantum meruit are barred by the statute of frauds. Glatt's services required him to use his "know-how" or "know-who" to find and negotiate with an underwriter (Freedman, 43 NY2d at 267). Moreover, "the bringing about of such an underwriting and eventual public offering, was 'an enterprise of complexity' which involved the acquisition of 'a significant interest in an enterprise'" (Newman v Crazy Eddie, 119 AD2d 738, 738 [2d Dept 1986], appeal dismissed 68 NY2d 998 [1986], quoting Freedman, 43 NY2d at 267 [alleged oral agreement to find and negotiate with an underwriter concerning a proposed public offering of over 30% of defendant's common stock barred by statute of frauds]; Goldfarb v Schaeffer, 2014 NY Slip Op 32589 [U], *3 [Sup Ct, NY County 2014], affd 135 AD3d 505 [1st Dept 2016] [oral agreement alleging that plaintiff was allegedly promised 20% of any equity interest in development of company barred by statute of frauds]). 
All of the services allegedly performed by Glatt fall within the scope of General Obligations Law § 5-701 (a) (10).[FN2]
 Counterclaimants allege that Glatt: (1) "performed due diligence on potential acquisition targets for dMY, structured potential investments and performed extensive and necessary work in connection with dMY's initial public offering, which was completed in February, 2020," (2) "selected and evaluated UBS, leading it to serving as one of two underwriters of the dMY IPO," (3) "worked with UBS to structure the enterprise and the IPO," (4) "performed in-depth evaluations of other potential underwriters, leading to the selection of Goldman Sachs as the second underwriter of the dMY IPO," and (5) "raised approximately $900,000 in urgently needed capital for dMY on an expedited timeline of approximately one week," which they allege was "essential to the success of the IPO" (NYSCEF Doc No. 127 ¶¶ 33, 36). These activities were performed "as part of or in furtherance of negotiation," i.e., they all "assist[ed] in the . . . consummation of the [IPO]" (JF Capital Advisors, LLC, 25 NY3d at 766; see also Whitman Heffernan Rhein & Co. v Griffin Co., 163 AD2d 86, 87 [1st Dept 1990], appeal denied 76 NY2d 715 [1990]). As acknowledged by counterclaimants, the very purpose of dMY was to go public in order to acquire or merge with [*7]another company using the proceeds of its IPO (NYSCEF Doc No. 127 ¶ 29). Thus, the alleged oral agreement is unenforceable given the absence of a writing.
Counterclaimants argue that Glatt "provided services clearly extending beyond the negotiation of a business opportunity" (Dorfman v Reffkin, 144 AD3d 10, 19 [1st Dept 2016] [plaintiff's causes of action for unjust enrichment and quantum meruit were not barred by statute of frauds where he performed a wide variety of services which took place after the company came to fruition]; see also CIP GP 2018, LLC v Koplewicz, 194 AD3d 639, 640 [1st Dept 2021] ["plaintiff alleges that the services it provided went beyond the mere negotiation of a business opportunity and, therefore, the claim is not precluded under the statute of frauds as embodied in General Obligations Law § 5-701 (a) (10)"]). Here, however, Glatt's services did not go beyond the consummation of the dMY IPO. Unlike Dorfman, counterclaimants do not allege that Glatt performed any services after dMY came to fruition. 
Moreover, contrary to counterclaimants' argument, they fail to plead the existence of a joint venture (see Goldfarb, 135 AD3d at 506; see also Richbell Info. Servs. v Jupiter Partners, 309 AD2d 288, 298 [1st Dept 2003]). Indeed, counterclaimants fail to allege any allegations as to the sharing of profits or losses (see Baytree Assoc. v Forster, 240 AD2d 305, 306 [1st Dept 1997], lv denied 90 NY2d 810 [1997] ["the record shows that the alleged oral agreement did not create a partnership or joint venture, since certain key terms of such an agreement—the sharing of profits and losses, joint control and management of the company, and contribution of capital—were not established"]). Therefore, counterclaimants have not alleged an oral agreement outside the scope of the statute of frauds. Furthermore, counterclaimants are "not permitted to pursue quasi-contractual claims for the sole purpose of circumventing the statute of frauds" (Future Star Hospitality Advisors, LLC v LaFrieda Veal & Lamb Co., Inc., 203 AD3d 509, 509 [1st Dept 2022]). 
In light of the foregoing, the fifth amended counterclaim, the seventh amended counterclaim, and the eighth amended counterclaim are dismissed.
D. Tortious Interference with Business Relations (Count Six)
The sixth amended counterclaim asserts a claim for tortious interference with business relations by Glatt and Dune Sponsor (NYSCEF Doc No. 127 ¶¶ 134-139). Specifically, counterclaimants allege that "Mr. You, dMY, and GMY were aware of Dune's planned IPO, of the role of the underwriters, that Dune had potential investors lined up, and of the role of Dune Sponsor and Mr. Glatt, [and] that Dune's IPO would be lucrative for Dune Sponsor and to Mr. Glatt" (id., ¶ 136). Counterclaim defendants allegedly interfered with the business relations between Dune, Dune Sponsor, and Mr. Glatt, and the underwriters and potential investors:
"by making false, disparaging, and impertinent allegations in this action and by contacting SPACInsider to draw public attention to such allegations and to make additional false and disparaging statements concerning Mr. Glatt's professional qualifications and conduct, with the intent to harm [Mr. Glatt's], Dune's and Dune Sponsor's reputation, contract relations, and business relations"
(id., ¶ 137). Counterclaimants further allege that "[a]s a result, the underwriters have not yet purchased the Dune securities and resold them . . ., and investors have been dissuaded from seeking to purchase Dune's securities to date" (id., ¶ 138). 

In moving to dismiss this counterclaim, counterclaim defendants argue that the Glatt and Dune Sponsor's tortious interference claim is based on false allegations. Additionally, [*8]counterclaim defendants assert that the claim is barred by the absolute privilege. Further, counterclaim defendants contend that the claim is contradicted by documentary evidence of Dune's successful IPO. Finally, counterclaim defendants submit that the claims are duplicative of the other claims. 
Tortious interference with business relations "applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant" (WFB Telecom. v NYNEX Corp., 188 AD2d 257, 257 [1st Dept 1992], lv denied 81 NY2d 709 [1993]). To state a cause of action for tortious interference with business relations, the party asserting the claim must allege:
"(1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with the third party"
(Amaranth LLC v J.P. Morgan Chase & Co., 71 AD3d 40, 47 [1st Dept 2009], lv dismissed in part and denied in part 14 NY3d 736 [2010]). As the Court of Appeals has held, "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship" (Carvel Corp. v Noonan, 3 NY3d 182, 192 [2004]). 

As a preliminary matter, counterclaim defendants have failed to establish entitlement to dismissal of this counterclaim based on "documentary evidence." Counterclaim defendants rely on an email between counsel in which SPACInsider's counsel stated that "my client had not corresponded or spoken with Mr. Harry You, and that SPAC Insider's reporting on the allegations regarding Mr. Glatt's exit/termination from GTY was based upon publicly-available information" (NYSCEF Doc No. 134 at 2). Nevertheless, the court finds that this email between counsel does not constitute "documentary evidence" for purposes of CPLR 3211 (a) (1) because the email does not contain facts that are "essentially undeniable" (see Whitestone Constr. Corp. v F.J. Sciame Constr. Co., Inc., 194 AD3d 532, 534 [1st Dept 2021]; Amsterdam Hospitality Group, LLC v Marshall-Alan Assoc., Inc., 120 AD3d 431, 432-433 [1st Dept 2014]). 
However, the counterclaim for tortious interference with business relations is legally insufficient. First, the court holds that the amended complaint's allegations that "Mr. Glatt's behavior and actions offended several GTY executives and members of the company's Board," "Mr. Glatt was disrespectful, insubordinate and attempted to sabotage the then-CEO of GTY, whom he reported to in addition to the CFO," which "led to the decision by the Board of GTY to fire him" (NYSCEF Doc No. 124, amended complaint ¶ 33) are absolutely privileged.
"It is well established that a statement made in the course of legal proceedings is absolutely privileged if it is at all pertinent to the litigation" (Lacher v Engel, 33 AD3d 10, 13 [1st Dept 2006], citing Youmans v Smith, 153 NY 214, 219 [1897]). "[T]he test to determine whether a statement is pertinent to litigation is 'extremely liberal'" (Flomenhaft v Finkelstein, 127 AD3d 634, 637 [1st Dept 2015] [internal quotation marks and citation omitted]). To be actionable, the offending statement must have been made "outrageously out of context" (id. [internal quotation marks and citation omitted]). And, where the privilege is invoked "any doubts are to be resolved in favor of pertinence" (id. [internal quotation marks and citation omitted]). 
Nevertheless, the First Department has instructed that "the privilege is capable of abuse and will not be conferred where the underlying lawsuit was a sham action brought solely to defame the defendant" (id. at 638). 
Considering the lenient standard, the court cannot conclude that the statements about Glatt's actions and termination were made "outrageously out of context." The court finds that the statements are pertinent to the nature of the parties' relationship. In addition, counterclaimants fail to allege any facts indicating that the instant action is a sham litigation brought solely to defame Glatt (cf. Halperin v Salvan, 117 AD2d 544, 548 [1st Dept 1986] [triable issues of fact as to whether common-law privilege applied where the plaintiffs did not vigorously pursue the putative class action, there was no motion for an order certifying the class, and there had been no discovery]).[FN3]

Second, counterclaim defendants cannot be liable for repeating the allegations regarding Glatt's termination to SPACInsider (NYSCEF Doc No. 127 ¶ 78). Civil Rights Law § 74 provides, in relevant part, that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." To be "fair and true," the account need only be "substantially accurate" (Holy Spirit Assn. for Unification of World Christianity v New York Times Co., 49 NY2d 63, 67 [1979]). Moreover, "a fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated" (Briarcliff Lodge Hotel, Inc. v Citizen-Sentinel Publs., 260 NY 106, 118 [1932], rearg denied 261 NY 537 [1933]). 
"Before addressing the issue of whether the defendants published a 'fair and true report,' it is also incumbent on the party asserting the privilege to establish that the statements at issue reported on a 'judicial proceeding" (Cholowsky v Civiletti, 69 AD3d 110, 114 [2d Dept 2009] [internal quotation marks and citation omitted]). "If the publication does not purport to comment on a judicial proceeding, Civil Rights Law § 74 is inapplicable" (id.). "If the context in which the statements are made make it 'impossible for the ordinary viewer [listener or reader] to determine whether defendant was reporting'" on a judicial proceeding, the absolute privilege does not apply" (id. at 114-115 [citation omitted]). "Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within section 74's privilege" (Lacher, 33 AD3d at 17). 
Given that SPACInsider merely restated the allegations of the amended complaint verbatim (NYSCEF Doc No. 129 at 5), these statements are absolutely privileged (see Lacher, 33 AD3d at 17 [attorney's "fair and true" report of malpractice action to New York Law Journal was absolutely privileged]). 
Third, counterclaimants fail to allege that any alleged improper conduct was directed at potential investors or underwriters (see Bradbury v Israel, 204 AD3d 563, 565 [1st Dept 2022]; Arnon Ltd. (IOM) v Beierwaltes, 125 AD3d 453, 454 [1st Dept 2015]; Rockwell Global Capital, LLC v Soreide Law Group, PLLC, 100 AD3d 448, 449 [1st Dept 2012]). In BDCM Fund [*9]Adviser, L.L.C. v Zenni (103 AD3d 475, 478 [1st Dept 2013]), a particularly instructive case, the First Department held that the trial court erred in sustaining a tortious interference claim where "plaintiffs failed to identify any disparaging statements made to these investors." Moreover, counterclaimants only make one reference to Cantor Fitzgerald and do not identify any other underwriters or any potential investors who have not purchased Dune's securities (NYSCEF Doc No. 127 ¶¶ 85, 86).
Fourth, counterclaimants have failed to allege that they would have obtained a business relationship with investors or underwriters but for counterclaim defendants' alleged interference (see Shawe v Kramer Levin Naftalis & Frankel LLP, 167 AD3d 481, 483 [1st Dept 2018], appeal dismissed 33 NY2d 1009 [2019], rearg denied 33 NY3d 1137 [2019] [conclusory allegations about potential relationship were insufficient to sustain tortious interference claim]). They merely allege, in a conclusory manner, that "[a]s a result of the dissemination of these falsehoods, Dune's underwriters . . . and potential investors have been dissuaded from committing to underwrite and invest, respectively, in Dune's initial public offering of securities" and that "the Underwriters have not yet purchased the Dune securities and resold them to investors as set forth by the underwriting agreement, and investors have been dissuaded from seeking to purchase Dune's securities to date" (NYSCEF Doc No. 127 ¶¶ 85, 138). 
Therefore, the court dismisses the sixth amended counterclaim.

 CONCLUSION
Accordingly, it is hereby
ORDERED that the motion of dMY Sponsor, LLC, dMY Technology Group, Inc., GTY Technology Holdings, Inc., dMY Sponsor II, LLC, dMY Technology Group, Inc. II, dMY Sponsor III, LLC, dMY Technology Group, Inc. III, Harry L. You, and Niccolo de Masi (sequence number 005), to dismiss is granted to the extent of dismissing count four (negligent misrepresentation), count five (breach of contract), count six (tortious interference with business relations), count seven (quantum meruit), and count eight (unjust enrichment) of the amended counterclaims, and the motion is otherwise denied; and it is further
ORDERED that counterclaim defendants shall file an answer to the remaining counterclaims within 30 days of service of a copy of this decision and order with notice of entry.
DATE 06/06/2023
ROBERT R. REED, J.S.C.

Footnotes

Footnote 1:Counterclaim defendants do not move to dismiss count one (NYSCEF Doc No. 153 at 6). The court notes that the counterclaims against GTY have been discontinued pursuant to a stipulation of discontinuance dated March 1, 2021 (NYSCEF Doc No. 137).

Footnote 2:Counterclaimants concede that "there is no allegation that he is seeking compensation for negotiating any actual acquisition or actual investment" (NYSCEF Doc No. 140 at 17).

Footnote 3:Contrary to counterclaim defendants' contention, Halperin is still good law (Flomenhaft, 127 AD3d at 638 [disagreeing with trial court's statement that Halperin "waned in precedential value"]; see also Pezhman v Chanel, 157 AD3d 417, 418 [1st Dept 2018], lv denied 31 NY3d 995 [2018], lv dismissed 32 NY3d 1018 [2018], cert denied 139 S Ct 489 [2018]; Casa de Meadows Inc. (Cayman Is.) v Zaman, 76 AD3d 917, 920 [1st Dept 2010]).